IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

AGF, INC.,

                Plaintiff,

v.                                     CIVIL ACTION NO. 2:04-0870

COLUMBIA GAS TRANSMISSION
CORPORATION,

                Defendants.

MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant Columbia Gas Transmission Corporation's Motion in Limine #2 to Exclude Speculative and Baseless Evidence of Damages (doc. 223). For the following reasons, the Court **GRANTS in part** and **DENIES in part** the motion.

I. FACTS

On August 19, 2008, the Court denied Plaintiffs' renewed motion for class certification. In that order, the Court discussed the underlying facts of this case in considerable detail. Accordingly, the Court will not repeat those facts here. Rather, the Court adopts and refers to the factual summary as laid forth in the August 19 Order. Additional facts, as necessary, will appear in the discussion section of this opinion.

## II. DISCUSSION

Plaintiff AGF, Inc.'s remaining damage claims fit into four categories. First, it seeks "direct" damages for breach of contract from 1995 through May 28, 1996, the date of the sale to Utilicorp, and for a period of years beginning in 1998. These damages are based on nomination cuts experienced by Plaintiff, allegedly due to the workings of an illegal scheme orchestrated by Defendant. Second, Plaintiff seeks "indirect" damages beginning in 1998. According to Plaintiff, indirect damages resulted when it failed to nominate gas for shipment because Defendant had posted on its electronic bulletin board that such services were not available for that day. Third, Plaintiff wishes to recover for lost income from 1998 through 2005. This category of damages is purportedly based on the income that Plaintiff would have earned during this period but for Defendant's breach of contract. Finally, Plaintiff attempts to recover for loss of asset value as of 1996. Loss of asset value reflects the discounted price at which Plaintiff was forced to sell its assets due to their decrease in value as an effect of the illegal scheme carried out by Defendant and the Select Shippers.

Defendant raises several challenges to these damages. The Court addresses each of them below.

## A. Plaintiff's Failure to Disclose Its 1996 Loss of Asset Value Claim

In its own words, Plaintiff "readily admits that the lost asset value figure in its revised damage claim is different . . . than the one offered previously[.]" *Plaintiff's Response*, at p. 3. Plaintiff's prior damages theory regarding lost asset value was based on the claim that the assets repurchased from Utilicorp, which came to form the basis of Mr. Fromuth's subsequent company, AGF Direct Gas Sales, could have been grown into a certain value by the close of 2005, had it not

been for the harmful effects of the alleged illegal scheme.[1]  Now, Plaintiff seeks to introduce testimony from Mr. Fromuth regarding Plaintiff's average gross margins from 1993 to 1995 and derive a lost asset value figure, in part, from them.  Specifically, Plaintiff wishes to multiply the average gross margin from these years by a multiplier of four.  From this, Plaintiff would then subtract the amount of the sale price of Plaintiff to Utilicorp, above what was paid back to Utilicorp in the 1997 asset repurchase.  However, the Court believes that permitting Plaintiff to change the basis for its calculation of damages at this late hour would prejudice Defendant considerably.

Plaintiff's previous damages theory regarding lost asset value was based on the alleged fact that the illegal scheme prevented Plaintiff from growing, by 2005, into the profitable company described in Attachments A and B to its Rule 26(a)(1) Supplemental Disclosures.  Plaintiff never alleged that its 1996 sale to Utilicorp constituted an injury in its own right.  Plaintiff's failure to present this theory in a timely fashion deprived Defendant of its right and opportunity to pursue relevant discovery.  Had Defendant been on notice that Plaintiff wished to present such testimony, it would have had reason to seek evidence surrounding the 1996 sale of Plaintiff's assets to Utilicorp, as well as the 1997 repurchase of those assets.  Together, these figures comprise one-half of the equation undergirding Plaintiff's new damages theory: the net sale price of Plaintiff to Utilicorp.  This value is critical to Plaintiff's calculations, a fact that highlights the shortcomings of Plaintiff's argument that it provided Defendant "the basis of the modification to [its] damages" when it disclosed the "Damage Reports" contained in Attachments A, B and C.  *Plaintiff's Response*, at p. 2.  Because these documents reveal, at most, only half of the foundation for Plaintiff's new

---

[1]Plaintiff places this value at somewhere between $11,760,000 and $12,880,000.  *Plaintiff's Supplemental 26(a)(1) Disclosures*, at Att. A-B.

damages theory, they could not have provided Defendant the information necessary to investigate that theory in a meaningful fashion.[2]

As stated, none of Attachments A, B and C provided Defendant with any reason to probe the facts surrounding the sale and repurchase of Plaintiff's assets. Each of these attachments purported to calculate damages incurred as of 2005. The choice of this year was in keeping with Plaintiff's then-existing theory of damages for lost asset value. While it is true, as Plaintiff argues, that Attachment C would have permitted Defendant to calculate the average gross margin between 1993 and 1995 that it now seeks to employ, there was no reason for Defendant to do so. Plaintiff's implication to the contrary amounts to an argument that Defendant was required to investigate potential, although undisclosed, alternative theories of damages that Plaintiff might later proffer. Such is clearly not the case.

The exclusion of Mr. Fromuth's testimony regarding lost asset value as of 1996 is not inconsistent with the Court's ruling in the Energy Marketing Services, Inc. (EMS) case. In that case, EMS proposed alternative damages theories for lost asset value that mirror the dual theories proposed by Plaintiff. Like Plaintiff, EMS sought to calculate damages based on the diminished value of the company at the time of its sale and as of December 31, 2005, based on projected earnings. However, unlike Plaintiff, these alternative theories were identified in a timely fashion.

---

[2]Plaintiff submitted excerpts of Mr. Fromuth's January 17, 2007, deposition, in which Mr. Fromuth testified about selling the company to Utilicorp. Among other factors, he discussed his opinion that, at the time of the sale, Plaintiff's business on Defendant's pipeline had declined due to the complexities of Defendant's pricing, presumably an allusion to the later-exposed alleged scheme. Mr. Fromuth was deposed again on December 16, 2008. However, upon review of the deposition transcripts, the Court finds Plaintiff did not adequately disclose its theory to Defendant. Defendant had no reason to probe more deeply with Mr. Fromuth as to the valuation of the company's assets or to seek discovery from Utilicorp or others.

Therefore, the Court permitted testimony regarding EMS's value at the time of its sale, notwithstanding the fact that the Court refused to allow testimony regarding lost asset value based on a hypothetical sale at the end of 2005. *April 27, 2009 Final Settlement Conference Transcript*, at p. 27, lines 16-19 ("So [EMS is] not going to be permitted to argue beyond the actual sale of the company and the value of the company at the time of that sale.") Here, Defendant lacked notice of Plaintiff's second theory of damages until approximately May 29, 2009, when Plaintiff's counsel sent Defendant's counsel a letter indicating that Mr. Fromuth would seek to testify about lost asset value as of the time of Plaintiff's sale in 1996.[3]  Accordingly, permitting testimony regarding lost asset value as of the time of Plaintiff's sale would prejudice Defendant in this case, even though Defendant would not have been prejudiced by the admission of similar testimony in the EMS case. For these reasons, Plaintiff may not offer testimony regarding its lost asset value.[4]

**B. Plaintiff's Loss of Income Claim**

In the alternative, Plaintiff seeks damages for loss of income from the beginning of 1998 through the end of 2005, notwithstanding the fact that it was sold to Utilicorp in 1996.  As Defendant points out, in the EMS case, "the Court ruled that loss of income could be recovered only

---

[3]The Court notes that Plaintiff waited more than a month after the Court's April 27 ruling before informing Defendant of its new damages theory.  On the other hand, Defendant timely objected to the newly proposed theory by filing the instant motion approximately two weeks after receiving Plaintiff's letter.

[4]Plaintiff also suggests that any prejudice created by its new damages theory is alleviated by the fact that the new calculations result in a considerably smaller figure than under its prior theory. This argument is of no merit.  Regardless of the amount of damages, Defendant cannot be made to defend itself against a damages calculation for which it lacked the opportunity to investigate the assumptions underlying that calculation.

through the date the entity ceased doing business . . . ."  *Defendant's Motion in Limine #2,* at p. 7; *see April 27, 2009 Final Settlement Conference Transcript*, at p. 27, lines 16-18 ("So [EMS is] not going to be permitted to argue beyond the actual sale of the company . . . .").  Plaintiff utterly fails to respond to Defendant's observation. *See Plaintiff's Response*, at p. 4-8.  Whatever claim Plaintiff has for loss of income, that claim crystalized no later than May 28, 1996, when Plaintiff was sold to Utilicorp.  Plaintiff cannot now seek to exercise a potential claim of AGF Direct Gas Sales, no matter how similar Plaintiff believes this company to be in its operations.  Accordingly, Plaintiff may not offer testimony of lost income after the date of its sale to Utilicorp.

## C. Plaintiff's Indirect Damages Claim

Similarly, Plaintiff endeavors to recover "indirect" damages for "inferred nomination cuts" that resulted when Plaintiff failed to nominate gas because capacity restrictions posted by Defendant on a given day would have made such nominations pointless.  In its response, Plaintiff makes no argument in defense of these damages.  In any event, these damages purportedly began in 1998, and they therefore suffer from the same defects described above.  Plaintiff ceased doing business as of May 28, 1996, at the latest.  Whatever claims Plaintiff maintains for inferred nomination cuts, the cuts at issue must precede this date.  Plaintiff cannot exercise the claims of AGF Direct Gas Sales that allegedly arose in 1998 and thereafter.  Because Plaintiff has not claimed damages for inferred nomination cuts preceding May 28, 1996, it cannot offer evidence of indirect damages.

**D. Plaintiff's Direct Damages Claim**

Lastly, Plaintiff seeks "direct" damages due to the actual nomination cuts that resulted when Plaintiff attempted to nominate gas, but had those nomination requests rejected by Defendant, allegedly because the illegally stored gas of the Select Shippers made it impossible for Defendant to accommodate those requests. Plaintiff seeks such damages for 1995 until the date of the sale to Utilicorp, May 28, 1996, and from 1998 forward. For the reasons discussed above, Plaintiff may not recover damages alleged to have occurred in 1998. However, Plaintiff may recover direct damages from 1995 until the time of its sale. Although Plaintiff's Second Amended Complaint repeatedly places the beginning of the scheme in February 1996, Plaintiff elsewhere provided Defendant with adequate notice that it would be seeking damages prior to that time. Dr. Harris's initial report clearly stated that "under the Breach of Contract Claim, TCO is responsible for the damage incurred by each  of the Plaintiffs that resulted from the illegal Park and Loan activity of all shippers engaged in such activity over the period January 1995-December 2005." *Report of Michael Harris, Ph.D.,* at p. 5. Furthermore, all of the breach of contract damages charts provided by Dr. Harris, including Plaintiff's, begin as of January 1, 1995. *See id.* at p. 7, 9, 10, 12. The unjust enrichment tables submitted by Dr. Harris also begin in January 1995. *See id.* at Ex. 3. Similarly, Dr. Harris's reply report also provides notice that Plaintiff intended to argue that the scheme began prior to February 1996. In that report, in response to Dr. Kalt's claim that he "analyzed data outside of the time period in which Plaintiffs' claim the alleged illegal activity occurred," Dr. Harris stated: "Documents produced in discovery indicate that the illegal activity did in fact occur prior to the date established (February 1996) in the FERC disgorgement order." *Reply Report of Michael Harris, Ph.D.,* at p. 10. In sum, Dr. Harris's reports provide evidence that the illegal scheme began in 1995,

as well as notice to Defendant that Plaintiff intended to make such an argument.  Therefore, Plaintiff may seek damages for direct cuts from 1995 through May 28, 1996.[5]

## III. CONCLUSION

Pending before the Court is Defendant Columbia Gas Transmission Corporation's Motion in Limine #2 to Exclude Speculative and Baseless Evidence of Damages (doc. 223).  For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** the motion.

Furthermore, the Court **DIRECTS** Plaintiff's counsel to arrange a telephonic conference in which multiple attorneys from each side, as well as the Court, can participate.  The Court lacks such telephonic conferencing ability itself.  The conference shall take place on **July 22, 2009** at **1:00 p.m.**

---

[5]Plaintiff previously did not seek direct damages for 1996, but advised Defendant in its May 29, 2009 letter that it would seek such damages through the date of the sale to Utilicorp, May 28, 1996.  In a footnote, Defendant argues that evidence of 1996 direct damages should be excluded because, like lost asset value damages, they were not disclosed in a timely fashion.  The Court rejects this argument.  The Court did not permit Plaintiff to change its theory regarding lost asset value damages because the new calculation was based, in part, on the transactions involving Utilicorp.  Because of the late disclosure of this theory, Defendant had not had an opportunity, or reason, to probe the details of these transactions.  Here, there is no similar prejudice.  Throughout the litigation, Plaintiff has claimed that it suffered damages due to nomination cuts resulting from the illegal scheme.  Moreover, Defendant was well aware, and has argued in this motion, that the gas imbalance transactions at issue began in February 1996.  Accordingly, requiring Defendant to defend itself against claims for lost damages in 1996 would not result in prejudice.  Plaintiff may pursue these damages.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER: July 21, 2009

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE